1

2                       IN THE UNITED STATES DISTRICT COURT
                             FOR THE DISTRICT OF MARYLAND
3                                 SOUTHERN DIVISION

4      UNITED STATES OF AMERICA      .

5             vs.                    .   DOCKET RWT-10-0171

6      GREGORY WIMSATT               .   GREENBELT, MARYLAND

7                                    .   OCTOBER 26, 2011

8

9                          TRANSCRIPT OF SENTENCING
                       BEFORE THE HONORABLE ROGER W. TITUS
10                        UNITED STATES DISTRICT JUDGE

11

12     A P P E A R A N C E S

13     FOR THE GOVERNMENT:          DEBORAH JOHNSTON, ESQ.
                                     ASSISTANT U.S. ATTORNEY
14

15     FOR THE DEFENDANT:           RICHARD A. FINCI, ESQ.

16

17

18     Court Reporter:              Sharon O'Neill, RMR
                                     Official Court Reporter
19                                   United States District Court
                                     6500 Cherrywood Lane
20                                   Greenbelt, Maryland 20770
                                     301-344-3227
21

22

23

24

25

1          THE COURT:  Good morning.

2          VOICES:  Good morning, Your Honor.

3          THE COURT:  Please be seated.

4          MS. JOHNSTON:  Good morning, Your Honor.  Your Honor,

5   we're here in the matter of United States vs. Gregory Wimsatt,

6   RWT 10-0171.  I'm Deborah Johnston, representing the

7   Government.  Soon to be seated with me is Task Force Officer

8   Dave Papalia.

9          THE COURT:  I remember you.  You used to work here.

10         MS. JOHNSTON:  I did.

11         THE COURT:  Welcome back.

12         MS. JOHNSTON:  Thank you, Your Honor.

13         MR. FINCI:  Richard Finci on behalf of Gregory

14   Wimsatt, Your Honor.

15         THE COURT:  All right.  Counsel, have you both had an

16   opportunity to review the Presentence Report, and in your case,

17   Mr. Finci, to review it with your client?

18         MR. FINCI:  Oh, yes, Your Honor.

19         THE COURT:  All right.  And I have received and

20   reviewed your memorandum and the attached report from Neil

21   Blumberg, who I have known for many years, very highly

22   qualified psychiatrist.  Are there any disagreements between

23   the parties as to the factual content of the presentence

24   report?

25         MS. JOHNSTON:  No, sir.

1          MR. FINCI:  None, Your Honor.

2          THE COURT:  All right.  And is there any disagreement

3   between the parties as to the Probation Officer's

4   recommendation to me that the total adjusted offense level,

5   after acceptance of responsibility, should be 21?

6          MS. JOHNSTON:  No, Your Honor.

7          MR. FINCI:  No, Your Honor.

8          THE COURT:  I assume there is no disagreement as to

9   the criminal history category of one, correct?

10          MR. FINCI:  Shouldn't be, Your Honor.

11          THE COURT:  Well, I have applied the guidelines,

12   which is step one, and that produces at offense level 21 and a

13   criminal category one, a guideline range of 37 to 46 months.

14   Is there going to be any motion by the government under 5K1.1?

15          MS. JOHNSTON:  No, there is not, Your Honor.

16          THE COURT:  Okay.  All right.  Well, then, that is

17   the recommended range under the guidelines.  I'll be glad to

18   here from you, Mr. Finci, with regard to sentence.

19          MR. FINCI:  Yes, Judge.  Thank you.  Judge, I know

20   that you've received and carefully reviewed the sentencing

21   memorandum and Dr. Blumberg's report.

22          We're asking the Court to consider 18 U.S.C, section

23   3582(a), and the Tapia case, in fashioning a sentence in this

24   case that focuses on my client's need for mental health and

25   drug rehabilitation.

1          I'll describe as his extreme need for mental health

2    and drug rehabilitation, drug treatment, as being paramount in

3    light of what is clearly a demonstrated long term drug

4    dependency, a co-occurring major mental health issue, as

5    documented and established with evidence by Dr. Blumberg, and

6    balance that against what was his role in the conspiracy in

7    this case, the overall time that he has already spent

8    incarcerated, both in CTF, in SuperMax, in a drug program and

9    on electronic home monitoring, since the date of his arrest,

10   over a year ago in this case, in fashioning the sentence.

11         While I don't want to repeat what I could not say

12   better than I could write, and have already written and

13   submitted to Your Honor, I think that it would be apropos to

14   make some personal observations of the time spent with the

15   defendant and that's what I would like to focus on, if I could,

16   Judge.

17         THE COURT:  All right.

18         MR. FINCI:  I've had a lot of time to spend with this

19   young man and his family.  And you know he's 26 years old.  He

20   comes from, as you can gather from the Presentence Report, a

21   loving family, a family that believes in unconditional love for

22   all of the children in the family.

23         And you've read in there that there's been some

24   problems with this family.  While they all love each other, my

25   observations have been that at times there is high conflict

1    among my client and his parents.

2         It's been this sort of high level conflict has been

3    going on for a long time.  In this case, a result of extreme

4    mental health problems and drug problems that simply have not

5    been fully and adequately dealt with.

6         My client is a night owl.  He has night owl hours.

7    He has a group of what his parents describe to me as, I will

8    call them sketchy friends and sketchy activities that he

9    involved himself in over a long period of time that have led to

10   these sort of conflicts.

11        He has been unable to maintain steady employment.

12   Judge, while this is a family of unconditional love, when Gregg

13   Wimsatt was arrested, his parents were unwilling to act as

14   third party custodians.  I found that remarkable.

15        This family has always provided a loving home and

16   environment, but they had decided that there was just too many

17   problems with Gregg.  They were afraid that he just could not

18   control his mental health problems, and his opiate abuse and

19   his marijuana abuse, and that they simply would not act as

20   third party custodians.

21        Can you imagine being from a loving family that

22   believes in unconditional love, and being in a situation as a

23   parent, and as a child, when parents would not act as third

24   party custodians.  I couldn't imagine it.  To me it underscored

25   the extreme problems that Gregg had.

1          It took months for the opiate abuse and dependency to

2    wane.  The toxins in the system, Judge, I have observed this

3    from extremely dependent individuals in the past.  It takes

4    quite some time for them to start thinking straight.  That

5    happened, as I mentioned in the sentencing memorandum, not when

6    my client was at the CTF, during his initial 45 days, not while

7    he was at the Carol Porto Treatment Center, not after he was

8    incarcerated at SuperMax in Baltimore.

9          Something like three or four months, after his

10   parents noted a change, a rationality, a change in thinking,

11   and they finally recognized that he had finally removed all

12   those toxins from his system in a way that they could now look

13   at him and could now support third party custodianship.

14         It was at that point in time that the forensic

15   evaluation, psychiatric evaluation, was recommended, and I

16   think, Judge, that Dr. Blumberg had really documented how the

17   vicious cycle of drug dependency and mental health problems in

18   Gregory Wimsatt's life has led him to where he is now, to the

19   rock bottom, where he is now to be sentenced in Federal Court

20   for a marijuana conspiracy.

21         Dr. Blumberg shows you how, and explains to you,

22   Judge, how the depression and other issues of a very severe

23   nature, trauma that he has endured, leads to self-medicating,

24   leads to increasingly high levels of addiction and dependency,

25   eventually maybe to a drug treatment program, which may then

1   lower the level of dependency and addiction, but then

2   eventually back to depression again and the whole cycle starts

3   over.

4         And what you see, Judge, in this scenario is that if

5   you don't address both problems, then neither problem gets

6   resolved.  And that is where Gregg Wimsatt stands here today at

7   age 26.  A young man who has never addressed both of his

8   problems, his mental health condition and his drug dependency

9   condition, in a way that will lead to him being a constructive

10  and contributing member of society, which is in the end I think

11  what everybody here wants.

12        He got some help while he was out at the Kolmac

13  Clinic.  He did well.  He continued to test negative.  He is

14  off to a good start, but still needs to be in an environment

15  where he receives co-occurring treatment.

16        He's a smart young man, Judge.  He has a lot of

17  potential to be productive and law abiding, to make a living,

18  but he needs much more.  And so we've recommended, we've

19  identified a program outside of Atlanta, Georgia, called the

20  Ridgeview Institute.  It's a psychiatric hospital that has both

21  inpatient and outpatient treatment on the premises, a place

22  where Gregg would be removed from the environment here, where

23  whatever distractions are applicable to him will not be there,

24  and where he can recover and where his parents, who have the

25  resources to send him there, are willing to send him.  They're

1   willing to pay what is necessary for Gregg to recover.

2          And so I hope the Court, in evaluating the 3553

3   factors in this case, will agree that in light of what has

4   happened in this case and where we are today, the need for

5   medical treatment, medical care for his psychiatric condition,

6   the need for drug treatment, and in general for correctional

7   treatment, is the factor that the Court should focus on in

8   fashioning a reasonable sentence in this case, and I hope the

9   Court will adopt the recommendation put forth in the sentencing

10  memorandum, that the Court can handle it one of two ways.

11         I would suggest the Court sentence my client to

12  prison for essentially time served, place him on supervised

13  release for the maximum period of time available to the Court,

14  and as a condition of supervised release, impose upon the

15  defendant that he successfully complete, attend, go through the

16  entire Ridgeview Institute drug treatment, inpatient drug

17  treatment program, and follow-up after care for the period of

18  time required by the Institute until released, that he report

19  directly to that program as soon as a bed is available, and

20  then abide by whatever other conditions of supervised release

21  that the Court feels it should impose in this case.  Thank you,

22  Your Honor.

23         THE COURT:  All right.  Would your client like to

24  address the Court?  I'd be glad to here from him.

25         MR. FINCI:  I'm nearly positive that he would.  One

1   other thing, Judge.  My client has had a medical condition, has

2   a back condition.  There was a violation noted for opiates on

3   October 14th in the Pretrial Report.  My client had a

4   prescription, Judge, from, for a drug known as Opana,

5   O P A N A, which has, which was prescribed by his physician,

6   and it has some opiates in it, opiate content in it, and I have

7   the prescription bottles.  I just want Your Honor to know that

8   he had a prescription.  He tested positive one time when he was

9   on this prescription from his back condition.

10          THE COURT:  Is that oxycodone?

11          MR. FINCI:  No.  No.  Opana is a -- it's called

12  oxymorphone HCL, is what the chemical content of it is,

13  according to the prescription.

14          THE COURT:  I was asking about his testing on

15  October 14th that reflected oxycodone.

16          MR. FINCI:  I would assume that oxycodone, and I

17  don't really know, Judge, I assume oxycodone, oxymorphone, I

18  more, oxycodone, I don't really know.  I assume that they're

19  the same.  They have the same positive opiates.  I don't know

20  how specific the Pretrial is.  There are other medications as

21  well.  This is the one that he -- he had another prescriptions.

22          THE DEFENDANT:  I didn't know the name of it.

23          MR. FINCI:  He has a prescription for oxycodone that

24  was filled about a month prior to that, and that as far as the

25  timing of which was drugs he took, he thought it was the Opana.

1          THE COURT:  What is the name of drug that you just

2    handed to Ms. Johnston?

3          MS. JOHNSTON:  Your Honor, one is for oxycodone.  The

4    prescription date is August 3rd of 2011, and one is for

5    alprazolam, which is September 2nd of 2011.  Alprazolam, I

6    think, is a schedule IV narcotic that you very often see people

7    who are abusing oxycodone, they will also take this drug as

8    well.

9          MR. FINCI:  That drug, I believe, is a Xanax, Judge.

10         THE COURT:  What?

11         MR. FINCI:  Xanax.  It's Xanax.

12         MS. JOHNSTON:  It's a schedule IV drug, but you'll

13   see people take that as well.

14         MR. FINCI:  Yes, Judge.  My client would like to

15   address the Court.

16         THE COURT:  All right.  I'll be glad to hear from

17   him.

18         THE DEFENDANT:  Well, Your Honor, I mean, I guess my

19   whole life, I guess until I was 12 years old, I have had, I

20   guess when I started going through puberty, you know, I have

21   noticed like that I was different from other people that I

22   knew, and I just, I knew I had issues and stuff.  But I was

23   like, you know, I guess I didn't know what was normal, because

24   I didn't know, you know, I can only think in my own brain.

25         I don't know what someone else thinks and how people

1  are supposed to feel and, but I notice, like, as I'm older now,

2  through this situation, when I think back on my past that, you

3  know, this is just been a self-destruction, vicious cycle that

4  I have been over and over again.

5          You know, drink by myself, you know.  I was 12 years

6  old.  I would -- I smoked marijuana.  You know, I was doing

7  drugs pretty much for all up until this Court, you know, I

8  never seen a psychiatrist.  I have never been through mental

9  health until, you know, later on in my life and, you know, I

10  just... my eyes are opened up a lot, even though I'm still

11  struggling, and I still, I know I have a problem and, you know,

12  it's really hard for me too, because I don't, you know, I feel

13  lost.  Sometimes I don't even know if there is a solution for

14  it, you know.

15          Like, sometimes it's just really hard.  And, you

16  know, like through this whole court process, you know, there is

17  a lot of things I never thought about.  When I was

18  incarcerated, you know, when my head got to clear up, you know,

19  I definitely saw that I wasn't only hurting myself, but people

20  around me.  So that's what, you know, made a big impact on me.

21          But still, at the same time, it's like, I feel like

22  this curse that I have, or whatever it is, it's hard for me to

23  even explain to people, because I don't understand it.  So,

24  but, you know, I see my brother, you know, he has been in and

25  out of jail, you know, for he will be in, he will be out, for

1  the same thing.  He has drug problems.

2           You known, my little sister, she's actually doing

3  good now.  She went to Ridgeview, but she has had drug

4  problems.  You know, my granddad was in a mental hospital and,

5  you know, my mom's side, I don't know what's on her side, but

6  there is something.  I don't know if it's genetic.  I don't

7  know what it is but, you know, I definitely want to fix it.

8           I don't want to, you know, just come out of this

9  situation the same person I was before.  So, you know, my dad

10  didn't even want to come today because, you know, he was

11  like -- he gets -- he is hurt seeing my brother go through this

12  and -- Sorry.  When I was incarcerated, I guess, you know, I

13  definitely, you know, learned a lot like, you know, I felt

14  punishment on, you know, deep levels, you know.  I lost the

15  girl that I love for six years and, you know, and -- Sorry.

16           You know, like, I realize that I guess I've been

17  self-destructive.  I was okay with that, but I'm not okay with

18  hurting the people around me.  So, you know, I have a four year

19  old son and this is affected him a lot.  I just want to be able

20  to do, to get better and be there for him.

21           So, I don't know.  I mean, I'm just trying.  I don't

22  know.  I'm just trying to explain what has gotten me here.  I'm

23  trying to do it in, you know, a short period of time but, you

24  know, it's hard, I guess.

25           I'm sorry that, you know, that everything I was

1    involved in and, you know, I didn't mean to harm anybody or,

2    you know.  I just want to get through this situation and, you

3    know, be able to be productive and support my son.  So,

4    sometimes it's like I feel like I may not be able to be fixed,

5    so.  I had more things I was going to say, but it's like all

6    slipped my mind.  But I just want to break this cycle.

7            Like, it was, you know, like you said, it was very

8    hard for me to -- when my parents wouldn't get me out, you

9    know, (crying) I'm sorry.

10           You know, I just want to fix this problem.  You know,

11   I don't know, you know, like I said, I guess, you know, I mean

12   it's been very hard for me to work and, you know, just do jobs,

13   like I get a job somewhere and then I would have a bad day or,

14   you known, I get fired or something, you know, so I haven't

15   been real reliable, I guess, you know.

16           And, you know, I tried, like, I was going to the

17   first things that I did when I actually made some money, what I

18   was the one to put myself to see a psychiatrist, you know, and

19   in this whole situation happened.  I was being already

20   miserable and, you know, I guess I had a situation where I

21   could have gotten myself out of the situation, but I was

22   already miserable.

23           So, I was just, like, being miserable there or here.

24   It doesn't matter, so, you know.  I guess I didn't take the

25   selfish way out, but I just figured, you know, I just wasn't

1    happy then.  I'm sorry.  I just can't.  My whole thoughts are
2    just mixed up right now.

3              You know, I just want to apologize to the Court but,
4    you know, anything I can do to make it up, you know, I will do
5    it.  So, you know, I just want to get through this situation
6    and be a different person.  I don't, you know, want to come out
7    and just have the same cycle.  I'm sorry.  I just lost it.

8              THE COURT:  All right.  Have you said everything you
9    would like to say?

10             THE DEFENDANT:  I feel like that is 10 percent of
11   what I was going to say, but I couldn't keep myself together,
12   you know.  Sorry, but, you know, I just can't think right now.
13   Could I come back up or something?  I just lost it.

14             THE COURT:  I mean, you have one be opportunity.

15             THE DEFENDANT:  I'm sorry.  Like I said, 12 years
16   old, been doing drugs my whole live.  I'm sorry.  Just, you
17   know, the way I saw this, I'm sorry.  Just trying to get by
18   tomorrow, so I was just trying to medicate myself.  The only
19   way that would support that was what I was doing.  So, I don't,
20   you know, I don't want excuses or anything.  I don't want pity.

21             I guess, like I said, when I was younger, you know, I
22   was embarrassed with my situation, and I just saw it as a
23   weakness so --  I'm sorry.

24             THE COURT:  All right.  Well, thank you, very much,
25   sir.  All right.  Ms. Johnston.

1          MS. JOHNSTON:  Yes, Your Honor.  You know, I

2     understand that Mr. Wimsatt has a drug problem, and I feel

3     deeply, deep sympathy for his parents, who are suffering as a

4     result of his activities and his behavior over the last several

5     years, but we are here before the Court because Mr. Wimsatt had

6     pled guilty to participating in a conspiracy to distribute

7     significant quantities of marijuana, not because he's a drug

8     user, but because he was engaged in the business of selling

9     marijuana.

10          Even in his statement to Dr. Blumberg, he

11     acknowledged that after he was robbed, while operating a

12     gambling house at age 22, he began selling drugs, so he has

13     been selling marijuana since age 22.

14          He now stands before the Court at age 26.  He

15     certainly was not concerned about using drugs when, on

16     April 18, 2008, when he was stopped by the police because of

17     his driving under the influence.

18          He brags to them about how, just a week earlier he

19     was stopped by Montgomery County Police and arrested with

20     14 pounds of marijuana, corresponding to the act that he pled

21     guilty to the statement of facts, the April 7, 2008 traffic

22     stop, when he had 12 pounds of marijuana.

23          So, we're seeing two sides of Mr. Wimsatt today.  We

24     have him painted as this poor individual who, from age 12 has

25     been using drugs, and because of that use of drugs this Court

1    should not sentence him to incarceration, should not give him a

2    sentence even within the guideline range but, instead, the

3    Court should do what the courts have done repeatedly to this

4    man, and that is give him another chance, okay, and we're doing

5    that here in this court, because under the Sentencing

6    Guidelines, his four prior involvements with the criminal

7    justice system are not counted in this criminal history record,

8    because they were drug activities, they're considered to be

9    part of his drug conspiracy activities, so he doesn't get an

10   increase in his criminal history.

11         He should be standing before the Court, had those

12   crimes been counted, facing a guideline range of 46 to 57

13   months, instead of the 37 to 46 months.  But what has happened

14   with Mr. Wimsatt, since age 22, or even age 18, what happens to

15   him is he goes into court, he gets a probation before judgment

16   at age 18.

17         At age 22, in April, 2008, after having had that

18   traffic stop with the 12 pounds of marijuana, he now gets

19   arrested again, and this time he has $7,100 cash in his pocket.

20   Okay.  Mr. Wimsatt was able to work and operate a business.  He

21   choose to operate an illegal business, and that was

22   distributing marijuana.

23         And he was doing quite well by it.  Made 71 --

24   walking around with $7,100 cash in his pocket and bragging to

25   the officers about having been stopped with all that marijuana

1   just a week before.  This isn't some junky who is going out

2   shoplifting so they can get their next fix of heroin.  This is

3   somebody who was a big man by selling marijuana, bragging to

4   the officers, had $7,100 in his pocket.

5           The next year, at age 23, again, he's involved and

6   charged with possession with intent to distribute marijuana

7   and, once again, he's given a break through great

8   representation by legal counsel in the state court in

9   Montgomery County.

10          And, indeed, in that case he's driving around in his

11  Mercedes and he has a fancy gadget on his front and back

12  tires -- tags, so he can cover them up should he want on the

13  flee from the police or have nobody recognize him.  So he

14  drives around in his Mercedes, although he is not able to have

15  a -- maintain regular employment, still being involved in

16  selling the drugs, because we know from what he told Dr.

17  Blumberg, he was selling drugs since age 22.

18          And then, again, again at age 24, once again he gets

19  involved with the police and is involved in reckless driving

20  and having possession of paraphernalia.

21          A second time, that happens December 10, 2009.  A

22  week later, once again, he's involved with the police.  And in

23  that instance, he's again in possession of paraphernalia and

24  possession of marijuana and prescription drugs without

25  labeling.  He is placed on probation.  His sentence is once

1  again suspended, and he is given 90 days of supervised

2  probation.

3         But does Mr. Wimsatt comply with his conditions of

4  supervised probation?  No.  His probation is violated, and his

5  probation, he serves some time in jail, 20 days incarceration

6  then, and his probation is closed unsatisfactorily.  But he

7  continues at that point to be engaged in his business of

8  distributing drugs, because he tells that to Dr. Blumberg.

9         So, now, we come here in this Court, in Federal

10  Court, and he now says to the Court "I have a drug problem.  We

11  need to fix it.  I can't hold a job."  He wants to break the

12  cycle.

13         There is a way to break the cycle for this defendant,

14  and the way to break the cycle for this defendant is to impose

15  a significant period of incarceration.  And I suggest to the

16  Court that that significant period of incarceration is 46

17  months, which is the top of the guideline before the Court, but

18  is also the bottom of the guideline he would be facing if his

19  prior convictions had applied.

20         And I suggest that to the Court because in the Bureau

21  of Prisons Mr. Wimsatt will be required to have a job, and/or

22  attend educational programs.  He will be compelled to live a

23  disciplined life, something that he has not done to this date.

24         He will be required to go and work every day, to get

25  up out of bed, have a job in the institution, go to classes in

1   the institution.  He will have the structure that he needs,

2   that he hasn't to this point.

3          To this point everyone has said "Okay, Mr. Wimsatt.

4   Let's give you counseling."  We have so many people who come

5   before this Court with drug problems who haven't had the

6   opportunities that Mr. Wimsatt had.

7          By my count, in going through Dr. Blumberg's report,

8   and I have known Dr. Blumberg probably as long as Mr. Wimsatt

9   has been alive, but he has had treatment with a doctor, one,

10  two, three, four, five, at least six different facilities,

11  seven actually, different facilities and/or doctors have

12  treated him.

13         In terms of his dealing with these people, even when

14  he was seeing the doctors, he still smoking marijuana.  Some of

15  the therapists he felt didn't help him, because they didn't

16  know how to deal with his depression.  He felt one doctor don't

17  care.

18         All along, he's putting the blame on other people for

19  his problems.  Even when he was placed at the treatment

20  facility as a result of his pretrial release in this case, he

21  was discharge from that treatment facility because he had a

22  positive marijuana test.

23         He now, in spit of saying he is addicted to all of

24  these drugs, he now goes to other drugs and gets more

25  oxycodone.  He is now on pretrial release.  He has a drug

1    problem, he's still taking the drugs he is addicted to.  He's

2    not getting off of the drugs.  He hasn't gotten off of the

3    drugs.  He's continuing to get the same drugs that Dr. Blumberg

4    says he has a problem with.

5           Your Honor, in terms of the 3553 factors, the Court

6    can consider a number of things, not just treatment of the

7    defendant, but the Court is to consider the nature and

8    circumstances of this offense and his history and

9    characteristics.  In this instance we have an individual who

10   has acknowledged that he had been involved in distributing

11   marijuana since age 22, and that that has continued over a

12   period of time.

13          He has engaged in that business over that period of

14   time, in spite of multiple brushes was the law, in spit of

15   being placed on probation, he has continued to engage in this

16   illegal activity, this illegal business.

17          For that reason, he needs to have a sentence that

18   reflects the seriousness of the offense, but also sends a

19   message and promotes respect for the law.  What kind of respect

20   is he going to have for the law if this Court does what

21   Mr. Finci asked him to do?  "Oh, I served 160 days in a local

22   jail.  The Court again is going to put me on probation, just

23   like I've gotten before in Montgomery County."  That does not

24   promote respect for the law.

25          What promotes respect for the law is to tell Mr.

1   Wimsatt "You have violated the law by engaging in this

2   marijuana distribution, and you need to be punished for that,

3   and I am going to treat you consist with the way other

4   individuals with your -- with your same sentencing guideline

5   range, characteristics, and I am going to impose a sentence of

6   imprisonment."

7          That sentence of imprisonment will do a number of

8   things for Mr. Wimsatt.  One, it will give him some respect for

9   the law.  Two, it will provide a just punishment for an

10  individual who over a series of years, at least from the

11  statement of facts, three years, and consistent with his

12  history to Dr. Blumberg, three to four years.  It will send him

13  a message that you have to be punished when you engage in these

14  kind of violations of the law.

15         It will also deter his future conduct, because

16  obviously, periods of probation have not deterred his conduct

17  in the past.

18         Three, it will give him what he really needs, and

19  that is the ability to develop some discipline and some

20  structure in his life, to have to go to a job, to have to

21  comply with rules and regulations in a structured environment,

22  something that he does not have and will not have if he's

23  released at this point on probation.

24         In addition to providing deterrence, it also will

25  protect the public from further crimes by this defendant.  He

1  has not done well on probation.  He hasn't done well on

2  pretrial release.  Again, now we have a positive urine test for

3  oxycodone.  I don't know how you can justify giving an addict

4  oxycodone when he's supposedly getting himself cleaned up and

5  getting off of those drugs.  He continues to take the drugs

6  that Dr. Blumberg says he needs to be weaned from.

7         We would ask the Court at this point to recognize the

8  sentencing guidelines, that they have taken into account any

9  number of factors.  They have not taken into account the fact

10 that he can commit the offense in this case while on probation

11 for a prior offense.  They have not taken into account his

12 prior criminal history.  And what's most important here is a

13 message has to be sent to Mr. Wimsatt, and that message has to

14 be that you don't violate federal laws.

15        Mr. Wimsatt needs to pay for the crime he has

16 committed, and that's not an isolated case of a failed

17 marijuana here, but it's engaging in that business over a

18 period of approximately three years, and doing it in huge

19 quantities of marijuana.

20        In addition to that, and as an aside, I would note to

21 the Court that his 161 days in jail, here in this report to Dr.

22 Blumberg, he admitted using heroin while in those two

23 facilities.  So, so much for learning a lesson from being in

24 jail.  And that, Your Honor, is on, I think, page four of Dr.

25 Blumberg's report.  So this man has not learned his lesson.

1   Has not learned his lesson, if he's still doing drugs while he

2   is incarcerated on the federal charge.

3          So I suggest to the Court that the best place for Mr.

4   Wimsatt is in the Bureau of Prisons, where he can get treatment

5   for all of his psychiatric and drugs problems.  There they have

6   programs for people with those problems.  The Bureau of Prisons

7   is focused on making sure that people, when they leave the

8   Bureau of Prisons don't come back to court.

9          And one of their goals is to decrease recidivism, and

10  they have a number of programs that provide individuals with a

11  second chance opportunity that, perhaps, Mr. Wimsatt can

12  benefit from.  But Mr. Wimsatt needs to pay a price for what he

13  has done, and he also needs the opportunity to develop the

14  discipline that he will have in the Bureau of Prisons.

15         So, for those reasons, we would ask the Court to

16  impose a sentence of incarceration within the guidelines, and

17  would suggest to the Court that a 46 month sentence at the top

18  of the guideline range is appropriate, given the fact that he

19  was on probation when he committed this offense, and his

20  criminal history does not reflect his prior criminal

21  involvement.

22         THE COURT:  All right.  Thank you, very much.  All

23  right.  The defendant comes before me today for sentencing

24  after entering a plea to a single court of conspiracy to

25  distribute and possess with intent to distribute at least

1   50 kilograms of marijuana.

2          I have applied the guidelines.  I have considered the

3   argument of counsel and the defendant's allocution.

4          The sentencing guidelines provide for arrange of

5   sentence from 36 to 46 months, and that is, as counsel are

6   aware, the beginning, not the ending point of sentencing.

7          What I am required to do is to examine the factors

8   set forth in section 3553 of Title 18 of the United States

9   Code, and determine whether a sentence within the guideline

10  range would be sufficient but not gather than necessary to

11  comply with the purposes set forth in subsection (a)(2).  So I

12  will review those factors and then make a determination of

13  whether a sentence in the guideline range would be sufficient

14  but not greater than necessary.  And, if not, determine whether

15  another sentence would be more consistent with the factors set

16  forth in section 3553.

17         I'm required to consider the need for the sentence

18  imposed to reflect the seriousness of the offense.  This is not

19  a minor offense.  This is a person involved in very significant

20  levels of marijuana distribution.  This is not somebody who is

21  a casual user who got some extra stuff for his buddies.

22         These are major levels requiring connection was

23  people outside the country, to be able to arrange quantities of

24  marijuana of this size.  That is an extremely serious offense,

25  and you look at what's going on with drug cartels in Mexico and

1    you can see what kind of people are supplying these drugs, so

2    it's not a minor matter.

3           Second, I'm required to consider the need to promote

4    respect for the law and to afford adequate deterrence to

5    criminal conduct.

6           It is clear in this case that this defendant has a

7    record, at a relatively youthful age, that clearly reflects

8    that he has not been deterred.  He has not shown respect for

9    the law, and he has engaged in repeated criminal activity, even

10   though he has gotten repeated breaks from the criminal justice

11   system.

12          I am required to consider the need to protect the

13   public from further crimes of the defendant, and that is a

14   factor that would argue in favor of incarceration, because he

15   is, at least so far, an unrepentant drug dealer, dealing in

16   very large quantities of marijuana.

17          I am required to consider the need to provide him

18   with needed educational or vocational training, medical care or

19   other correctional treatment in the most effective manner.  I

20   conclude that while Ridgeview Institute is a very respected

21   organization, that is something that would have been more

22   appropriate for him when he began this series of criminal

23   activities, not after he has been through the Court system so

24   many times, and I conclude that while the Ridgeview might be an

25   appropriate place for him to utilize once he's released from

1   incarceration, it is not a proper alternative to a guideline

2   sentence.

3         I am required to consider the need to avoid

4   unwarranted sentence disparity among defendants with similar

5   records that have been found guilty of similar conduct.  And

6   that, of course, is one of the principle roles that the

7   guidelines play, and in this case the guidelines have

8   effectively attenuated a lot of what is set forth in his

9   criminal history, because it is considered part of the

10  conspiracy.  But Ms. Johnston points out that were it not for

11  not counting some of these earlier matters, he would have been

12  in a higher criminal history category.

13        Finally, I'm required to consider the need to provide

14  restitution to any victims of the offense, and that's not a

15  factor that I can seriously address in this case, but that does

16  mean there has not been community hard by virtue of the

17  activities of the defendant.

18        Having considered all of those factors, I conclude

19  that, first of all that a guideline sentence would be

20  sufficient but not greater than necessary to meet the factors

21  set forth in section 3553 (a)(2) and I, therefore, do not

22  believe that a variant sentence would be appropriate in this

23  case.

24        Having considered all of those factors, and the

25  record of the defendant, I conclude that a sentence of 42

1 | months would be appropriate.  I think he needs a significantly

2 | structured environment to deal with his mental health and

3 | addiction issues, and he does have a significant amount of time

4 | he has already been incarcerate that he will get credit for, of

5 | course.

6 | I will recommend that if he is eligible, that he

7 | participate in the 500 hour residential drug abuse program in

8 | which if he is eligible for it and he succeeds in participating

9 | in it could reduce his sentence by as much as a year.

10 | I will also recommend to the Bureau of Prisons that

11 | he receive mental health counseling and treatment while he is

12 | incarcerated.  Is there any request, Mr Finci, for a place of

13 | incarceration recommendation.

14 | MR. FINCI:  Your Honor, it's my believe that locally

15 | in Cumberland they have the residential drug program.

16 | THE COURT:  They do.  They do.

17 | MR. FINCI:  So I would ask that Cumberland be --

18 | THE COURT:  I will recommend to the Bureau that it be

19 | Cumberland.  That's only about two and a half hours away from

20 | here.  I will place him on a period of supervised release of

21 | three years.  I will impose the standard and mandatory

22 | conditions of supervision, with the additional provision that

23 | he participate in a treatment program relating to substance

24 | and/or alcohol abuse, that he participate satisfactorily in a

25 | mental health treatment program, that he provide the Probation

1   Officer with access to any requested financial information,

2   that he satisfactorily participate in a vocational or

3   educational program, which is quite important, because he

4   really hasn't been doing except criminal activity since he

5   reached the age of 21.

6           I will direct that he forfeit to the United States

7   the matters that were seized from the him, the $32,000, the

8   five time zone wrist watch, the diamond fashion ring, all that

9   are set forth in the plea agreement.

10          I will require, if he has not already done so at the

11  time of his release, that he pay the special assessment of

12  $100.  I will not impose any fine in light of his apparent lack

13  of any assets at this time, and I will impose the mandatory

14  special assessment of $100.

15          The specific items to be forfeited are those that are

16  set forth in paragraph 11 on page five of his plea agreement

17  and those will be incorporated into the criminal judgment.

18          I want to advise the defendant that he has a right to

19  appeal the sentence that I have just imposed to the United

20  States Court of Appeals for the Fourth Circuit.  If you wish to

21  appeal, you must do so within 14 days of today's date, or your

22  right to appeal will have been waived.

23          If you're unable to pay the filing fee for the

24  appeal, there are procedures that the Clerk of the Court, or

25  Mr. Finci can explain to you that have to be waived.

1    I will point out that in paragraph 14 of your plea

2  agreement, on page six, that you have waived your right to

3  appeal your conviction.  You have already waived your right to

4  appeal the sentence, unless it is unlawful or unless the

5  sentence imposed utilizes an offense level above 21.

6    Since the offense level utilized in this case is 21,

7  there is a contractural restriction on your right to appeal

8  your sentence.

9    To the extent that you have any remaining rights to

10 appeal that have not been waived by contract, you must initiate

11 an appeal within 14 days.  Do you understand that, sir.

12    THE DEFENDANT:  Yes.

13    THE COURT:  All right.  Anything further, Ms.

14 Johnston?

15    MS. JOHNSTON:  Your Honor, I have a Consent Order of

16 Forfeiture for the --

17    THE COURT:  Yes.  Hand that to me.

18    MR. FINCI:  I have reviewed the Order, Judge.  It's

19 appropriate in light of the plea.

20    THE COURT:  The outer limit for surrender will be

21 December 12th.

22    MR. FINCI:  December 12th, Judge?

23    MS. JOHNSTON:  Your Honor, the Government would move

24 to --

25    THE COURT:  Ms. Johnston, you're talking in the

1   opposite direction.

2           MS. JOHNSTON:  I'm sorry.

3           THE COURT:  My wife does that to me all the time.  I

4   can't hear her either.

5           MS. JOHNSTON:  I apologize, Your Honor.  The

6   Government would move to dismiss the pending indictment as it

7   applies to this defendant.  He pled guilty to a superseding

8   information.

9           THE COURT:  All right.  That will be granted, and I

10   will sign the Consent Order of Forfeiture and direct that that

11   be filed.

12           MS. JOHNSTON:  Thank you, Your Honor.

13           THE COURT:  All right.  Thank you, very much.  If you

14   could clear out quickly, we have a jury trial that's resuming.

15           MR. FINCI:  Your Honor, I'll see you tomorrow.

16

17                 COURT REPORTER'S CERTIFICATE

18                       -oOo-

19           I certify that the foregoing is a correct transcript

20   from the record of proceedings in the above matter.

21

22   Date:

23                        /s/ _____

24                        Sharon O'Neill

25